The next matter, number 22-1245 and number 22-1246, United States, ex rel. Lovell et al. and United States, ex rel. Sanborn v. Athenahealth, Incorporated. At this time, would Attorney Hunt introduce herself on the record to begin? Highland Hunt for Appellants Lovell and McKusick. I will address fees in multi-relater settlements. Mr. Schlichter will address the issue of fees for all claims resolved by the settlement. And if I may, I'd like to reserve two minutes for rebuttal. You may. The False Claims Act sets a two-part test for fees, government intervention and receipt of proceeds. That happened here. The government intervened, all parties settled, and Lovell and McKusick received a share of the funds from that settlement. Athenahealth agrees on the two-part test,  After receipt of proceeds, at the fee stage, the relater is adjudicated first to file. As the Sixth Circuit held, the statutory text does not require that, and Millennium does not require it either. Millennium holds that when share entitlement is litigated Can I just stop you just so I understand the text of the statute? You seem to read the statute to say you can't qualify for attorney's fees unless you received proceeds? Yes, Your Honor. Where does it say that? I believe that, and this is following the Bryant Court's reasoning as well, because it says if the government proceeds, a person shall receive proceeds, and then any such person shall also receive an amount for reasonable expenses. It's the shall also receive that's doing the work to suggest that. But why does that mean that in order to get attorney's fees, you have to be one of the people that receives the proceeds? Well, Your Honor, we haven't made this argument. I just don't see textually where is that coming from. It's true that you shall receive proceeds if the government proceeds with an action brought under Section B. Such person shall receive at least 15 percent, but not more than 25 percent. But does that mean if you didn't receive proceeds, you're not a person? Well, so it's any such person who receives the fees, and I think that refers back to the preceding sentence, which is any payment to a person under the first or second sentence, and so then you go back to the first sentence. Why wouldn't the such person be just the person in 3730B, person who brings a civil action for a violation? Well, Your Honor, we'd welcome that interpretation as well. Is there any reason to reject it? I have a reason. What is the reason? If you look at the text of D, and you look down to the third sentence, it says any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person, which could easily be read to refer to any such person who has received a payment under the first or second sentence of the paragraph, admittedly, there are different readings available, but that's a potential reading of it. And then if you go back to D1, it says, if the government proceeds with an action brought by a person under subsection B, which refers you back to subsection B, then we may or may not get back to the question of who is the first relator. And I agree with you that the decision in Millennium did not address this precise question. I think it's a very hard question. But I have to say I also see no textual support for a requirement that the defending company has to go litigate the question of who is the first relator before the government reaches a settlement. There's nothing in the text that suggests that. Well, can I ask, here's one possible, I think this is just building on Judge Lynch's question, so why don't you respond to that statement when Judge Lynch says there's nothing in the text. What do you see in the text that suggests otherwise? So, I mean, what I see in the text that suggests otherwise is the fourth sentence, any such person, whether that person is the person who's received fees or just one in which the government has intervened, we would win either way, shall also receive reasonable expenses. There's nothing in the fee awarding sentence that permits the defendant to challenge first to file at the fee stage. So necessarily the defendant can either move to dismiss. Am I right that a relator under B needn't allege that they are a first to file in order to state a claim? Well, I think actually Millennium would say that failure to meet the first to file bar is akin to a, like if a defendant were to make a motion that would be something like a 12-6 motion. In your complaint, does the plaintiff have the burden of alleging that they are first to file? No, Your Honor. And, of course, they would have no way of knowing because. So one possibility is that the significance. The statute's unusual because it refers to settlement. So at the time you're settling the claim, why wouldn't we just understand that person to be a B-1 person that you're settling the claim with? And if that's right, then it's hard for that person to become a B-5 person post-settlement because you have to be the same person throughout the proceedings. The parties could arrange to waive fees or whatever they want to do in their own settlement agreement. But in terms of you're just saying what the statute contemplates at the time of settlement, unless you've made an argument that they're a B-5 person, it seems to me you're a B-1 person. So I'm not sure I completely followed the question, but let me try. I think at the time of settlement, if you are a defendant and you enter a settlement with multiple relators in two actions, then you have accepted this case as a multiple-relator case. And you have here, like you do, the relators. But that means you're treating each relator as a B-1 relator, right? I'm treating each relator as someone who brought an action under Section B, which is all that's required. What if there's 100 or 200 relators? Then the problem gets bigger and everybody would be entitled. Well, Your Honor, I think there's several gatekeepers that would stand in the way of that happening. The first is government intervention. The government has no—they regularly gatekeep. You see this in Millennium. They intervened in only some of the relators' actions and not others. They're not going to intervene in 100 actions to then settle them all. But the defendant is also its own gatekeeper, and that's the whole point. They can either move to dismiss or they can— They know how much fees they're on the hook for when they do the settlement. So what's the problem, right? Well, certainly they can enter in those discussions. And our point is that a clear rule that just establishes that if you sign a multi-relator settlement and you agree that rather than litigate first to file, the relators are compromising settling that issue, then you are on the hook for paying the fees. There's nothing in the settlement agreement that says the defendants have given up this right  And the government, for better or for worse, takes absolutely no position on any of these questions in the settlement agreement. I'm afraid your position leads to further litigation, unnecessary litigation, and there are a lot of settlements now. There was never any clear notice to the defendants that if you want to raise the first relator bar, you damn well better do it as part of the settlement negotiations. And I doubt that the government, which so far has taken a total hands-off on these, wants to have to add that complication to settlement agreements. So I kind of view this position as going against what is a good government policy of trying to accomplish settlements. So, Your Honor, I disagree, and I think the government, by encouraging the relators to cooperate here and enter a sharing agreement, which they did, and that's at 166 and 167, and as they also did in Bryant, indicated that the government's interest is in settling first-to-file issues rather than have them litigated. It's defendants' position. Defendants' position is going to always result... I said what in the agreement settled that question? I saw no language to that effect. So I would point to, at Addendum 28, the clause where all parties acknowledged that Lovell and McKusick would share, would receive a share of the funds paid by the United States to Sanborn, is where the government, as well as Athena, acknowledged that the relators were going to share the proceeds rather than litigate first-to-file. I would just point out that Athena's position requires litigation of first-to-file always. It's just they want to wait until after settlement to litigate it. So we're saying it should be brought first. Can I take you back to... because I do want to ask you about the word payment because it concerns me for your argument, and the way payment gets into the case is if the interpretation that you were pressing and the judgements was suggesting is the right interpretation as opposed to the one that I was suggesting, and that any such person is referring back to that statement that says any payment to a person. So the person is a person who got a payment. And I suppose one thing in the text that supports that reading is the word also in the next sentence. So any such person also shall also receive. Well, that suggests that the person they have in mind is somebody who's already received something, which would mean they had to get a payment. Well, my concern is if that's right, how could it be that we could say anybody other than Sanborn got a payment from the defendant? Well, the payment in the text of that sentence is, quote, shall be made from the proceeds. So that's the only requirement for the payment. And here we have it. It's traced in the agreement. It specifies, and all parties acknowledge, the payment is going to go to Sanborn. Sanborn is going to disperse the share to Lovell and McKusick. So there's a clear tracing that the payment Lovell and McKusick receive is from the proceeds. It doesn't say from the government or paid directly from the government. It just says from the proceeds. And so we think that that statutory requirement is met. That's very helpful. You know, I've been worried about the case in which, during a settlement, the government takes a position that proceeds are due not only to the first relator, but also to other relators that it feels have significantly contributed to its success in pursuing the case. That was a concern that the Sixth Circuit had. And a strict first relator rule would seem to tie the government's hands about that. So I can conceive of a situation in which the government wants to acknowledge this, specifically provides in the agreement for a payment, and whether or not it gets into attorney's fees, it thinks it has set the groundwork for attorney's fees for those efforts. I don't actually read this settlement agreement as doing so. And there seems to be a dispute between the defendants and yourselves about the degree to which you all, counsel and your party, worked with the government to achieve this result. So help me out here. Yes, Your Honor. You know, we agree with Athena that this test does not require scrutinizing time records for how collaborative was a relator. It's the government's intervention that does the work to indicate the government believed the collaboration was worthy. When the government doesn't think that, it doesn't intervene. And you can see that in Millennium where, again, they didn't intervene in all the relator's actions. Furthermore, so at the time that the settlement agreement with all the parties was signed, the finalization of the amount of the proceeds that all the relators were to share had not been concluded. So there is a sharing agreement between the United States and all three relators that further follows along with the settlement agreement to say that the payment is going to go to Sanborn and then go to Lovell and McKusick. So I think that further puts the government in premature on it. And in addition, we have record evidence. Just one last, in just ten seconds, and then I think you will hear from your co-counsel. Is there anything in the payment that was received by your clients was made by whom? Sanborn or by the government? The government paid it to Sanborn. Sanborn paid it to our clients. So that means the payment came from Sanborn? I would say he disbursed the funds, yes, Your Honor. Sanborn disbursed the funds from the government to our clients. There's no word disbursed in the statute. From the payment came the most immediate. I mean, I would say that from does not imply directly from, so I think it's still a payment from the government. That's our textual reading. But the intermediate step back in the payment chain was Sanborn, yes. Okay. Thank you. Thank you, counsel. Let me just, if you don't mind, the text says any payment shall be made from the proceeds. And so you say the term proceeds includes your situation. Yes, Your Honor, because the money that we received is from the proceeds of the settlement. Even after it's been fully acquired and is now possessed by Sanborn? Well, it's kind of like a constructive trust. I mean, we would have no problem tracing this money if we were in an equitable remedy situation. Thank you. Any further questions, Your Honor? Thank you. Thank you, counsel. At this time, would Attorney Schlichter please introduce himself on the record to begin? Good morning, Your Honors. May it please the Court, my name is Andrew Schlichter, and I represent appellant and relator Jordy Sanborn. I'd like to reserve, if possible, one minute for rebuttal. That's fine. Thank you. Your Honors, the trial court's ruling that relator Sanborn's settled meaningful use claim was not successful and, therefore, that relator Sanborn's attorney fee must be reduced was incorrect. In fact, the meaningful use claim was fully settled in the settlement agreement, along with relator Sanborn's other claim, the exchange for payment by Athena of $18.25 million to the United States. Under the fee-shifting provisions of the False Claims Act set forth in 3730D, relator Sanborn is, therefore, entitled to a reasonable attorney fee for his prosecution of the meaningful use claim. The idea, Your Honors, that the settled meaningful use claim was not successful simply doesn't hold water for multiple reasons. First of all, any suggestion that relator Sanborn did not, in fact, settle that claim and instead abandoned it is manifestly untrue. And this is because the settlement agreement explicitly and expressly releases, excuse me, settled both of relator Sanborn's claims in exchange for that payment from Athena, which was not, and this is important, allocated between the claims. And that's at addendum, page 25, paragraph 3 of the settlement agreement. And I think that paragraph, Your Honors, quickly dispatches with any argument that the meaningful use claim was not settled because it makes release of both claims that relator Sanborn brought a condition of Athena's full payment of $18.25 million to the United States. Additionally, any suggestion that the government's decision to intervene dictates success. In other words, that the government's intervention decision determines whether the meaningful use claim was successful is incorrect. And that's apparent from the plain language of 3730D, which provides that when a relator's claim settles, the relator is entitled to a reasonable attorney fee regardless of whether the government intervenes. Moreover, we would argue, Your Honors, that 3730D provides a clear statutory basis for attorney's fees on the meaningful use claim. Under 3730D1, there are two criteria for a relator to meet in order to obtain a fee, which was just discussed. There's proceeding with the action brought by a relator, and second, there's receiving proceeds. Both criteria are met here because the government intervened in relator Sanborn's action and relator Sanborn received proceeds from the settlement agreement. The district court's contrary holding that the term action in 3730D1 should be read to mean claim and not what it says, and therefore that a false claims act defendant need only pay attorney's fees for work on claims in which the government specifically intervenes violates statutory interpretation principles. Counsel, your comments make me ask this question. Literally, how did the mechanics of payment work? Is the sum paid to the government, which then disperses to the relator, whatever is the appropriate share agreed on? That's correct, Judge Lynch. Okay, so it's kind of similar to the problem we just discussed with your sister, which is to say you got proceeds. They weren't directly from defendant. They were from the government, and then the government pays on to you. As to some of the plaintiffs here, but not all, correct? Because some of the relators here got their money from Sanborn rather than directly from the government. Yes, I represent appellant Sanborn who received his money from the government, and that money was paid by Athena to the government, which is how this money is dispersed. But are you arguing about the reasonableness of the fees only as to Sanborn? That is our argument, Your Honor. I think that some of our argument can be applied to the other relators as well, but I'll let them speak as to any issues they have specifically. What the district court, though, held was that the term action means claim. What's different about the cases that the district court cited for that conclusion in this case is that those cases concerned different parts of the False Claims Act, specifically the public disclosure bar, which does not or did not prior to 2010, contain both the words action and claim. That was amended by Congress in 2010 to add the word or claim. What courts, including the courts that the district court cited, had held was that action can mean claim because there was no other word there to remove that inconsistency. That's not the case with 3730D. There, the words action and claim both appear, and Congress presumably meant what it said when it differentiated between those two terms. But even, Your Honors, if the district court were correct, that Relator Sanborn is not entitled to attorney's fees for the meaningful use claim under 3730D1, he would unavoidably be entitled to fees under 3730D2, which independently provides that a defendant that settles an action or claim in which the government does not intervene also must pay attorney fees. There is simply no cogent explanation for how a False Claims Act defendant can settle a claim and then avoid payment of attorney's fees under 3730D2. So I understood your opposition to argue you didn't seriously make that claim to the district court. It was almost a throwaway line with no real briefing on it. And so more or less you've waived or forfeited that claim. Do you want to talk about that, your alternate ground? Yes, Judge Lynch. So what we argued in the district court was that 3730D1 provided a clear basis for attorney's fees on the meaningful use claim because the two requirements were met. The court adopted an argument that hadn't been advanced by the parties to say that action meant claim, and therefore that 3730D1 was not a basis for fees on the meaningful use claim. However, the necessary consequence of that holding is that 3730D2 must apply. So while we did not specifically get into the argument, there is no way around the conclusion that 3730D2 applies in light of what the court held. And we did, of course, argue extensively that 3730D entitles Relator Sanborn to an attorney fee on the meaningful use claim. Do you know why the district court excluded the reply brief you filed even in the award it gave you? Just to be clear, Judge Lynch, it didn't exclude the reply brief. It excluded some time spent on the reply brief. And our belief is that that was oversight. We indicated in both our opening brief and our reply brief in the district court that we would be submitting a supplement for time spent preparing the reply brief and other work. We did that 10 days after our reply brief was filed, and we believe it was just overlooked in oversight on the district court's part. How much money is involved? It was $83,000 approximately, which involves some work leading up to the reply brief and then also approximately 50 or so hours in the reply brief. Any final questions? No. Thank you. Thank you, counsel. At this time, would Attorney Walters please introduce herself on the record to begin? May it please the Court, Sarah Walters on behalf of Athena Health. The text of the False Claims Act makes clear that while fee shifting is authorized, it's not unlimited. And what the relators here in both Lublin-McCusick and Sanborn would have this court adopt is a standard by where when there's been a global settlement, all relators who subscribe to the settlement are entitled to all of their fees, regardless of the contribution that they made to the case, regardless of whether they were first to file, and regardless of which claims were settled and what the settlement payment was made for. And that simply is not consistent with the statute. If you could just take it in pieces and start with the first to file bar issue. Absolutely. And the related payment issue. Yes. So going back to the text of the statute, which I know is where we all need to begin, which is the statute D-1 specifically incorporates the entirety of subsection B. It doesn't just incorporate D-1. But you can't. Here's my problem. There's no way that I can. Well, how can you read D-1 to be describing a settlement involving a action brought by a second relator who's barred by B-5? Well, so. Do you see the point? So just to make sure I understand the question. So how can D-1 be applying to a global settlement where we've got a second to file relator essentially? Global settlement is your term. But I'm just saying D-1 is contemplating the government having settled an action. Yes. Well, as I read it, the settlement of that action is contemplating an action brought by the first relator. Otherwise, the government couldn't have intervened because there would be no viable action. Is that wrong? I think the government can intervene in a second to file action, and they do. They do do that. And that analysis is on a claim-by-claim basis when it comes to relator share, which is the second. But the person they're talking about in D-1 has to be the first relator, because the second relator is not entitled to the 15 percent of the proceeds. That's right. So that's my problem is D-1 is contemplating a settlement involving a B-1 person, not a B-5 person. I see. In terms of separating, saying that D-1 is not even contemplating a settlement with regard to a B-5 person. Correct. Well, it's certainly not, and it's not contemplating, it's certainly not authorizing a share of the relator's proceeds going to that B-5 person either. That may be right, and then we get to the payment issue and all of that. Right. But I'm just saying the idea that you can relitigate whether the B-1 person is a B-5 person post-settlement, I have trouble squaring with that first sentence of D-1. Well, as a practical matter in the settlement agreement, as Judge Lynch pointed out, Athena explicitly reserved in the settlement agreement that we'd be litigating, reserved our right to. . . Well, they didn't mention first to file. On all available grounds. It was not just limited to 37. . . About the fees, availability of fees, which is a little bit ambiguous. Yes, agreed with the availability of fees. If the settlement agreement said that, you know, the first to file will be relitigated, then that's just part of the settlement. They can agree to whatever they want about fees. But I'm just saying as a statutory matter, which is how you've argued it. Yes. I just don't see the first sentence of D-1 helping you because it seems like it's just necessarily contemplating a settlement involving an action by the first relator. I think it does necessarily contemplate a settlement of an action with the first relator. So if that's right, the person they're talking about throughout D-1, including with respect to reasonable attorney fees, is what's being treated as a first relator. So there's no way to then transform that person post-settlement into a second relator who's fired by first to file. Do you see the point? I do see the point. Okay. So following that, assume that's right. All right. Can you still win? And if so, how? Yes. Okay. And this is why. Because going back now to the third and fourth sentences of D-1, is that we're talking about the person who's entitled to fees, such person. It must have also received a relator share of the proceeds of the settlement of the claim. And so this gets back to the payment issue that we were talking about before, which is that in this case, only Sanborn received a relator share of the proceeds of the claim. The settlement agreement is explicit about that. Okay. If that were true, that would leave open, we just wouldn't have to decide, the question of what would have happened if this had been structured as a settlement with all of the parties in which payment of the proceeds went directly to all of them from the government. That's exactly right. And that would just be an open question, what do you do in a case like that? Your position is that because of the way they structured it, the money going to Sanborn, then Sanborn to the others, the others simply aren't getting a payment from proceeds. That's exactly right. And the government in a number of cases, including the Bryant case, which out of the Sixth Circuit, certainly has the ability and regularly does pay multiple relators directly. And the theory behind that is that even if one could have litigated whether they were barred by first to file, we just don't know at that stage. And if the government treated them as if they weren't all barred by first to file, because there were differences in their claims, then that was how they were treated. And if you settled with them that way, then that's what they were. Or you could make a post-settlement agreement for them to waive fees or structure the amounts however you wanted. That in some cases can happen. In other cases, it's made as part of the settlement agreement that it's obvious who's first to file on a particular issue and who would be entitled, whose matter is not precluded by B-5, if you will. Okay, so last question in this vein is what do you say about your opponent's position and the Sixth Circuit's position that that is too narrow a view of payment from proceeds when it's a clearly contemplated downstream recipient, not of just some bystander, but an actual party to the settlement? And so why read it in such a fussy way that they're not getting a payment from the proceeds when they were obviously in everybody's contemplation? Well, I think for two reasons. One, because the settlement agreement was explicit of who was to get the proceeds, which frankly does show the government's view of who was most helpful. And it's obvious from the timing of the complaints that we do have access to that Lovell McHugh's complaint brought no new issues to the government's attention. So we have some visibility into that. Taken to its rational conclusion, however, the Sixth Circuit view that a private agreement between relators or an agreement among the relators to share the proceeds, which could be for any numeral reasons. Sanborn may well have wanted to avoid frankly what would have probably been relatively specious first-to-file litigation.  There are all kinds of very practical, reasonable reasons why Sanborn may have agreed to share a portion of his proceeds with Lovell McHugh's. We also have no visibility into that agreement. For all we know, he's shared a dollar with Lovell McHugh's. And this does get to the issue of when you have multiple relators. Maybe it's not 100, but it could be 5, 10, where the government makes the assessment which one has provided the most valuable information and how it pays proceeds to one. The relator shares the proceeds with multiple, again, no visibility. Perhaps it's a dollar and now can seek millions of dollars in fees from the defendant. Just so I'm following, everything you're saying works fine if we reject your first argument. Yes. But accept your second one. Exactly, Your Honor. Except your second argument, do we even have to get into the question of your first argument? No, Your Honor. And I believe the dialogue has established that depending on what the government chooses to do in settlement agreements, those may be quite different questions than the precise question we have here. Yes, Your Honor. I think that's right in terms of how the government intends to treat different relators in the context of a settlement. Okay. Thank you. And let me ask you, Counsel. In any settlement agreement, the attorney's fees can be, I think you mentioned it, can be contemplated that multiple people get attorney's fees, but here it wasn't done. Exactly, Your Honor. So what you're saying is you have to go through a statute, and under a statute, you know, too bad, correct? That's exactly right, Your Honor. The attorney's fees could have been resolved by the settlement agreement, and sometimes that can happen. In this case, it did not, and they were explicitly, the issue was specifically reserved for litigation. But I just want to be clear. I understand if we do your, if we've decided in your favor on the second question, we wouldn't have to resolve the first question. We could just assume it. Yes. But I want to understand how much we could assume against you and still have you win. And my understanding is that suppose the settlement agreement, just the language of it, is just unclear as to what it's saying about whether you can post-settlement litigate the first-to-file issue, or it's silent on that question. And it was structured as everybody signed, all the relators signed the agreement. The proceeds were distributed to the government. The government then distributed those proceeds allocating the amounts for each action and gave 15 percent at least of each action's proceeds to each of the relators. We could assume, I think you're saying, that each one of those relators would be entitled under the statute to attorney's fees absent something in the settlement waiving their right to get it. And you would still win because this case is not that case because here the proceeds did not go to each relator from the government. It went to a relator, Sanborn, and then he had a side deal that paid these other relators. Is that the idea? I agree with that. I agree with that, Chief Judge Barron. Again, that assumes that you're deciding against us on the first sentence. I just want to get a sense of how much we can decide against you just by assuming. We wouldn't have to resolve it. But even if we assumed all of that against you, you still say you win because of the way this structured the settlement here. Yes. Okay. Which, again, not to come back, which is, of course, supported by the record in terms of the complaints that are in the record in that Lovell and McKusick brought nothing new to the government's attention. Let me also ask if the relators could have also agreed, regardless of your agreement with them, they could have agreed to split the fees or something in between them as well. As far as we know, because we have no insight into the actual agreements between them. But they could. And from your perspective, it's not your problem. It's whatever they decide. Absolutely. That's correct. If I may briefly touch on Appellant Sanborn's comments on the claims, unless there are other questions on the claim of McKusick. Well, just one thing that occurs to me, because Judge Lynch pointed out earlier the government hasn't made its view clear. But I suppose one reason why it wouldn't is because the point we've been talking about really isn't of concern to the government, precisely because it's a side deal. So the case to decide the issue of whether you can litigate the first-to-file bar post-settlement is a case in which the relators were paid proceeds by the government itself. Because then the government would obviously have an interest in weighing in on that question more than it might in this case. I think that's right. I will note, and actually I should have answered this probably earlier when you were talking about the first sentence. Millennium was a decision where first-to-file issues were specifically reserved for post-settlement. There was a settlement with multiple relators. And it was agreed in the settlement agreement that issues of first-to-file would be reserved for post-settlement. But the statute doesn't prohibit that from happening when the settlement is clear. The problem is when it's unclear, how do we read the statute as setting the default? Understood. I appreciate that. Briefly, if I may, on Sanborn's argument that essentially by agreeing to dismiss his second certification claim, that somehow shows a level of success on these claims. It's not consistent with the way the statute works, which is, again, a claim-by-claim analysis. Nor does it make any sense. I mean, here the covered conduct was very clear in the settlement agreement. The payment was tied to the covered conduct. The government's claim was very clear. It was based specifically on the marketing programs in the covered conduct. As the district court found in its discretion, frankly, the claims were completely distinct. This is not a case where you have any overlapping work. One was a technical issue that the record evidence is the government barely investigated. And one was an anti-kickback statute marketing issue. On the issue of the D-1 through D-2, whether the fact that he could be entitled to fees under D-2, that didn't happen here. Judge Lynch, as you pointed out, he may well have waived it below. But more importantly, for the purposes of this, for the purposes of where we are now, he chose not to object to the settlement. He chose not to litigate the certification claim, which he could have done. That's logistically, procedurally possible. And so the argument that he might be entitled to fees under D-2 also fails. Thank you. Thank you. If I may, the 83,000 on the work done on the reply brief, it may have been an oversight. Do you have a position on that? We do. The district court had the entire record before him and chose not to award it. A reply brief is not required. It's not even allowed as a matter of right. And so the fact that it was certainly a reasonable and not an abuse of his discretion to refuse to allow fees for a brief that's not even required to be filed. So we view it as not necessary to remand on that issue. Thank you. Okay. Thank you. Thank you. Thank you, counsel. At this time, Attorney Hunt, if you could reintroduce yourself on the record to begin. You have a two-minute rebuttal. Hi, Lynn Hunt for Lovell and McKusick. So I want to start with the sentence about payment from the proceeds. As we discussed at the outset, nothing in that sentence specifies payment from the government. And I think the government, in fact, does have an interest because its standard practice, as was illustrated in Bryant, is not to allocate fees amongst a whole bunch of relators. Instead, it paid two of the relators in that case directly, and they distributed to the rest. Here, not through a side agreement. It's not a side agreement. It was acknowledged by all of the parties. And moreover, if you look at Ad 28, where all the parties acknowledged that the fees, the money that was going to be paid to Sanborn first, and then administratively transferred to Lovell and McKusick, all of the relators stated there that they were retaining their claim to the share. There was never a concession that Sanborn was the only one entitled to the share. In fact, the parties settled that. And by settling that issue, Athena got extensive benefits. They got dismissal of both actions, all the claims, and a broad release of claims. And so having entered into that kind of deal, acknowledging, they weren't surprised that Lovell and McKusick got funds from that settlement. Because having entered into that kind of settlement and acknowledging it, they opted for taking the benefits and they should have to pay the obligations, which is fees. To do the contrary and require the government to do the allocating in order for and directly pay relators in order for them to get fees is going to gum up settlements because it's going to require litigation of first-to-file issues that otherwise could be settled as they were here. Why would it require first-to-file litigation? Because that, I mean, at least in practice, and this is in the Shire case and in the way they paid the fees out to Bryant, the government, if the relators do not agree on a sharing, what the government does is it comes up with its idea of who should get what and it takes it to a court. And the Shire Regenerative case, which they cited, is an example of that. The government would prefer that relators just agree and it doesn't have to spend its resources figuring that out. And it's not always easy. As you know, millennium, the district court and this court came out differently. Even if you're just comparing the complaints, deciding what is and what isn't new is not straightforward. Thank you. Thank you, Counsel. At this time, Attorney Schlichter, if you'll reintroduce yourself back on the record, you have one minute rebuttal. Andrew Schlichter for Appellant and Relator Jordy Sanborn. Your Honors, I'd like to make two very brief points on rebuttal. First of all, Athena's payment was not tied to the covered conduct in the government's complaint and intervention. There is no support for that. It's not in their brief. It's not in their argument. The payment was expressly conditioned on the release of both of Relator Sanborn's claims, and that's paragraph three of the settlement agreement at addendum page 25. Second, Athena concedes at page 21 of its brief that, quote, a Relator is entitled to proceeds and fees if a claim is settled, period, full stop. This is absolutely correct, and it ends the inquiry. The Meaningful Use claim was indisputably settled. Under the plain language of the False Claims Act, as Athena concedes, Athena is required to pay an attorney fee for work on that claim. Are there any other questions? Thank you, Your Honors. Thank you. Thanks, all of you. That concludes argument in this case.